John P. Kristensen, SBN 224132
**CARPENTER & ZUCKERMAN**
8827 W. Olympic Boulevard
Beverly Hills, CA 90211
Telephone: 310-273-1230
*kristensen@cz.law*

Mary Schiavo (*Pro Hac Vice Pending*)
MOTLEY RICE LLC
28 Bridgeside Blvd
Mt. Pleasant, SC 29464
Telephone: 843-216-9000
Facsimile: 843-261-9450
*mschiavo@motleyrice.com*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA – SAN DIEGO DIVISION

| | |
|---|---|
| ADDAS SAADAT and ARMIN REA SAADAT, individually and as Personal Representatives and Successors-In Interest to the ESTATE OF SARA SAADAT,<br><br>Plaintiffs,<br><br>vs.<br><br>UKRAINE INTERNATIONAL AIRLINES,<br><br>Defendant. | Case No.: '22CV14  H   JLB<br><br>**COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

COMES NOW, Plaintiffs, ADDAS SAADAT, father of Sara Saadat and ARMIN REI COLLOSI, brother of Sara Saadat, individually and in their own right, (hereinafter referred to as Plaintiffs), and on behalf of all heirs and beneficiaries, brings this Complaint against Defendant, UKRAINE INTERNATIONAL AIRLINES (hereinafter referred to as UIA).

## JURISDICTION

1. Jurisdiction over these claims and UIA exists pursuant to 28 U.S.C. § 1331 under a treaty of the United States of America, the Convention for the Unification of Certain Rules Relating to International Carriage by Air, signed at Warsaw on October 12, 1929 (known as the "Warsaw Convention") 49 stat., Part II, p.3000, 2 Bevans 983, 137 L.N.T.S. 11, as modified by the Convention for the Unification of Certain Rules for International Carriage by Air, opened for signature on 28 May, 1999 ICAO Doc. 9740 ("known as the "Montreal Convention"), which, among other things, eliminates any limitation on damages and confers jurisdiction for these claims in the United States of America in Article 33 of the treaty. Both the United States of America and Ukraine are signatories to the Warsaw and Montreal Treaties.

2. Furthermore, this court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000 exclusive of interests and costs. Diversity exists at the time of commencement of this action because Plaintiffs reside in California and Iran, and Defendant, UIA, is a Ukraine airline with its headquarters in Kyiv, Ukraine. UIA maintains a principal base of operations in New York, New York, and was conducting substantial business in and had sufficient contacts with California and specifically Los Angeles International Airport for this court to exercise jurisdiction.

///

///

## PARTIES

3. ADDAS SAADAT is the father of Sara Saadat and ARMIN REI COLLOSI is the brother of Sara Saadat. Plaintiffs are the Personal Representatives and Successors-In-Interest to the ESTATE OF SARA SAADAT, pursuant to Cal. *Code Civ. Proc.* § 377.11, *et seq*. There are three plaintiffs: (1) the ESTATE OF SARA SAADAT; (2) ADDAS SADDAT; and ARMIN REI COLLOSI.

4. UKRAINE INTERNATIONAL AIRLINES is an airline based out of Ukraine. UIA maintains a principal base of operations in New York, New York, and conducts substantial business in and had sufficient contacts with California and specifically Los Angeles International Airport for this court to exercise jurisdiction.

## VENUE

3. Venue in this district satisfies the requirements of 28 U.S.C. § 1391 in that, as set out in this Complaint, Defendant, UIA conducts substantial business in and is subject to personal jurisdiction in this district including substantial operations and flights at Los Angeles International Airport. Venue in this district satisfies the requirements of § 1391 and Defendant is subject to personal jurisdiction in this district and has sufficient contacts with this district for this court to exercise both jurisdiction and venue. Article 33 of the Montreal Convention recognizes the courts of this District as a proper jurisdiction.

## NATURE OF THE CAUSE OF ACTION

4. This is an action for damages on behalf of the Plaintiffs for personal injuries and death suffered when as a result of an accident on UIA Flight PS752 on January 8, 2020, en route from Khomeini International Airport in Tehran, Iran to Boryspil International Airport in Kyiv, Ukraine, Sara Saadat was injured and killed by the negligent and knowing, intentional and egregious actions of UIA.

## FACTUAL ALLEGATIONS

5. On or about January 8, 2020, UIA was a common carrier which

operated a Boeing 737-800 aircraft as UIA Flight PS752 (hereinafter the "subject flight" or "the flight"), offering non-stop service between from Khomeini International Airport in Tehran, Iran to Boryspil International Airport in Kyiv, Ukraine. At all times relevant to this Complaint, UIA owned, operated, and supervised the subject flight through its agents, employees and contractors, including its flight crew, cabin crews, dispatchers, schedulers, managers and others.

6. On or about January 8, 2020, Sara was a passenger onboard the subject flight engaged in international travel pursuant to a ticket purchased in San Diego, in the United States of America.

7. On or about January 8, 2020, Sara was ticketed to land at Kyiv, where Sara was to connect with another UIA flight, to Toronto, Canada, to Edmonton, Canada, on her way to her final destination of San Diego, California.

8. Sara was a resident of San Diego, California, and begin her round trip flight from San Diego.

9. Sara was just 23 years old, in good health, and was a Clinical Psychology student at Alliant International University in San Diego, CA.

10. On January 8, 2020, Sara boarded the UIA Flight PS752 from Tehran to Kyiv to journey to San Diego.  Approximately 3 minutes into flight, the aircraft was struck by two surface-to-air missiles which resulted in the crash. UIA operated the fatal flight despite numerous warnings of the unsafe skies over Iran.

11. In the days and hours leading up to the crash, Iran and other nations were engaged in openly hostile acts of aggression toward each other and others.

12. On January 3, 2020, Iranian Major General Qasem Soleimani was killed by a United States military drone strike. This was confirmed by the President of the United States who stated that Major General Soleimani was planning attacks on U.S. embassies in the Middle East.

13. Shortly thereafter, several rockets hit near the U.S. Embassy in Baghdad and the Iraqi Air Force base at Balad, north of Baghdad, Iraq. These were reported to have been in retaliation for the death of Iranian Major General Soleimani.

14. While there were no casualties resulting from the January 3, 2020, missile strikes, on January 4, 2020, the U.S. President publicly warned Iran that if it attacked any U.S. assets or personnel in the region, the U.S. would target 52 Iranian sites representing the 52 Americans taken hostage by Iran in 1979, and that the U.S. would strike "very fast and very hard."

15. On January 5, 2020, Iran announced that it would no longer abide by the limitations in its 2015 nuclear agreement with the U.S., China, France, Russia, the United Kingdom, Germany, and the European Union.

16. On January 8, 2020, at approximately 02:00 local time, approximately 15 ballistic missiles launched from Iran struck two Iraqi bases housing U.S. troops, one in Irbil and one at Al Asad west of Baghdad. These Iran attacks on Iraq occurred a few hours after the burial of Iranian Major General Soleimani and was reported to be in retaliation for his death.

17. The missile attacks were widely reported in the media almost immediately after they occurred.

18. A few hours later, after the ballistic missile attacks at the Al Asad Airbase, the UIA Flight Crew prepared Flight PS752 for take-off from the Khomeini International Airport in Tehran.

19. During their flight planning, two passengers failed to board the aircraft, and the Flight was delayed approximately one hour while the baggage for these passengers was located and removed from the aircraft.

20. These events of increasing violent and open aggression between the U.S. and Iran which included missile and drone attacks were widely reported and well known.

21. The situation became critical a few hours before UIA Flight PS752 when Iran launched missiles against U.S. troops at the Al Asad airbase in Iraq – the second such missile attack in five days, and after the U.S. President warned Iran of a "very fast and very hard" response should U.S. interests in the region be attacked.

22. The skies over Iran, and in particular near the Khomeini International Airport in Tehran, were unsafe.

23. On January 8, 2020, at 00:07 UTC (03:37 Teheran local time), 1 1/2 hours after the missile attack on the Al Asad airbase, and 2 3/4 hours before UIA Flight PS752 left the gate, the U.S. FAA issued an Emergency Order NOTAM prohibiting all U.S. operators from flying over the airspace of Iraq and Iran "...due to heightened Military activities and increased political tensions in the Middle East, which present an inadvertent risk to U.S. civil aviation operations due to the potential for miscalculation or mis-identification." While this NOTAM was issued by the FAA and, by its terms, was binding on U.S. air carriers and commercial operators, it was immediately available to all air crews around the world, including UIA and the crew of PS752, as soon as it was issued by the FAA.

24. UIA and the crew of PS752 knew or should have known about the FAA Emergency NOTAM prior to the Flight. UIA and the crew of PS752 had, or should have had updated and current threat and risk assessments for the Flight's point of origin (Khomeini International Airport in Tehran, Iran), point of destination (Boryspil International Airport in Kyiv, Ukraine) and the routing in between, and this type of security information was or should have been in the Flight Crew's pre-flight briefing packages for consideration as they did their flight planning.

25. Under the circumstances, UIA the Flight Crew, for whom UIA is responsible, knew or ought to have known of the clear and present danger to the Flight and the passengers when they decided to dispatch the Flight for take-off in the morning of January 8, 2020.

26. In the circumstances of open and aggressive hostility between the U.S., Iran and other countries that existed in the days and hours leading up to the flight, UIA and the flight crew, for whom UIA is responsible, should have cancelled the flight, and their failure to do so was negligent, or in the alternative, an act of willful misconduct which directly resulted in the deaths of the passengers and damages to the Plaintiffs.

27. Defendant UIA is a common carrier and owed the highest degree of care to all persons aboard its aircraft including Sara, and owed a duty to all persons aboard the subject flight including Sara to exercise the highest duty of care to prevent death and injury of any kind, including injury and death as a result of UIA's operations, failure to adequately assess risk, including delaying or cancelling the flight until it was safe to do so. As a direct and proximate result of the willful misconduct, UIA is liable for the damages sustained by Plaintiffs and Plaintiffs are entitled to recover such damages to the extent allowed under all applicable treaties and laws.

## CAUSE OF ACTION

28. Plaintiffs re-allege and incorporate by reference as though fully set forth herein, all paragraphs of their Complaint.

29. This action is brought pursuant to the provisions of the Montreal Convention which states including but not limited to the following, among other provisions:

> Article 17
> Liability of the Carrier
>
> The carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking.
>
> Article 19

Delay by the Carrier

The carrier is liable for damage occasioned by delay in the carriage by air of passengers, baggage or cargo. Nevertheless, the carrier shall not be liable for damage occasioned by delay if it proves that it and its servants and agents took all measures that could reasonably be required to avoid the damage or that it was impossible for it or them to take such measures.

Article 21
Negligence or Other Wrongful Acts or Omission of the Carrier

1.  For damages arising under paragraph 1 of Article 17 not exceeding 100,000 Special Drawing Rights for each passenger, the carrier shall not be able to exclude or limit its liability.

2.  The carrier shall not be liable for damages arising under paragraph 1 of Article 17 to the extent that they exceed for each passenger 100,000 Special Drawing Rights <u>if the carrier proves that</u>:

<u>(a) such damage was not due to the negligence or other wrongful act or omission of the carrier or its servants or agents; or</u>
<u>(b) such damage was solely due to the negligence or other wrongful act or omission of a third party. [Emphasis added.]</u>

Article 22
Limits of Liability in Relation to Delay, Baggage and Cargo

2.  In the carriage of baggage, the liability of the carrier in the case of destruction, loss, damage or delay is limited to 1,000 Special Drawing Rights for each passenger unless the passenger has made, at the time when the checked baggage was handed over to the carrier, a special declaration of interest in delivery at destination and has paid a supplementary sum if the case so requires. In that case the carrier will be liable to pay a sum not exceeding the declared sum, unless it proves that the sum is greater than the passenger's actual interest in delivery at destination.

Convention for the Unification of Certain Rules for InterNational Carriage by Air, signed at Montreal, Canada on May 28, 1999.

30. At all times relevant, it was the duty of UIA, by and through its agents and employees, to exercise the highest degree of care in the operation of the subject flight and to safeguard and care for the safety, health and life of its passengers.

31. The events alleged herein which occurred on board flight PS752, and UIA's failure and refusal to properly assess risk and failure and refusal to delay and or cancel the flight constituted an accident or unexpected unusual event that was external to Sara as a passenger.

32. At all times relevant before the subject flight, the United States of America and Ukraine signed and incorporated into UIA's tariffs and contract of carriage all relevant treaties and international agreements under which UIA assumes unlimited liability for passenger injury caused by an accident or unexpected unusual event within the meaning of the Montreal and other conventions.

33. The Treaties, Conventions and Agreements were intended, among other things, to be for the benefit of and to induce the patronage of the traveling public.

34. UIA is liable for the injuries and damages to Plaintiffs and all injuries, damages, losses and death to Sara, because the accident causing the injuries and damages took place on an international UIA flight, as defined by the Warsaw and Montreal Conventions, amendments.

35. As a direct and proximate result of the foregoing, Plaintiffs are entitled to recover damages alleged herein and UIA is liable for compensatory damages in a sum within the jurisdiction of this court.

36. The failure of UIA to adequately perform its duties as set forth and herein, by providing safe passage and reasonable safety measures constitutes a breach of its duty which included the highest standard of care owed as a common carrier to its passengers.

37. UIA was negligent in the following particulars:

a) Dispatching the aircraft for Flight PS752 when they knew or ought to

have known it was dangerous to do so;

b) Failing to cancel Flight PS752;

c) Failing to delay Flight PS752 until it was safe to proceed;

d) Failing to have an adequate, or any, method and/or system of risk assessment;

e) Failing to employ and/or properly train staff with respect to effective risk assessment;

f) Failing to adequately, or at all, supervise staff tasked with risk assessment;

g) Failing to employ an adequate number of staff for the purposes of effective risk assessment;

h) Failing to provide the flight crew with adequate and current risk assessment information prior to or during their planning of the flight which would have revealed to the flight drew that it was dangerous to proceed with the flight;

i) Failing to provide the Flight Crew with adequate guidance regarding the risk to the flight which would have revealed to the flight drew that it was dangerous to proceed with the flight;

j) Directing the flight crew to proceed with the flight when it was dangerous to do so;

k) Deciding to direct the flight crew to proceed with the flight when they knew it was dangerous to do so, with wanton disregard for the safety and welfare of the passengers and flight crew;

l) Deciding to put the financial interests of the airline before the safety and welfare of the passengers and flight crew by directing the flight crew to proceed with the flight when they knew it was dangerous to do so;

m) Purposely ignoring the concerns of the flight crew and/or others in favour of the airline's own interests; and, or

n) Failing to adequately train the flight crew, dispatch, and other

employees and agents of UIA on the evaluation of risk to the flight at the point of departure, the point of destination and the routing of the flight between the point of departure and the point of destination, which training would have resulted in the flight crew making the correct decision to not proceed with the flight.

37. The injuries, fear of impending death, multiple explosions and impacts and pain and terror associated therewith and death suffered by Sara were a direct and proximate result of UIA's negligence, or other wrongful act or omission in the ownership, supervision and operation of the subject flight and failure and refusal to delay or cancel the flight. The injuries suffered by Plaintiffs were proximately caused by the negligence of UIA and not some other person or entity, and UIA is liable for all damages according to proof unless UIA proves some other entity is entirely responsible for the negligence, injury and damages.

38. As a result of UIA's actions and inactions, Plaintiffs and Sara suffered severe physical injuries, emotional trauma directly related to the physical injuries, loss of income, wrongful death, funeral and other loss of life expenses, survival claims, property loss, and additional and continuing substantial damages and losses in amounts to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE Plaintiffs, having complained of the actions and inactions, of Defendant UIA, Plaintiffs request relief commensurate with the cause of action set forth herein, as the court and jury deem fair and just, including but not limited to, all damages allowed by law and allowably damages for sorrow, mental anguish and solace which may include society, companion-ship, comfort, guidance, kindly offices and advice of the decedent; compensation for reasonably expected loss of income and income accumulation of the decedent and her estate and services, protection, care and assistance provided by the decedent, expenses for the decedent incident to the injury resulting in death, pain and suffering during and after injuries, explosions and multiple impacts, and before death; emotional

distress from these injuries, reasonable funeral expenses; and all fees, costs and all proper additional relief, such as attorney fees, as this Honorable Court deems equitable, just and proper. This includes requests for all compensatory and special damages to be proven at trial, including general damages for Sara Sadaat's pain and suffering during her impending death.

Dated: January 6, 2022

**CARPENTER & ZUCKERMAN AND MOTLEY RICE LLC**

*/s/ John P. Kristensen*
John P. Kristensen
Mary Schiavo

***Attorneys for Plaintiffs***

**DEMAND FOR JURY TRIAL**

Plaintiffs and each of them demand a jury trial on all issues and causes of action.

Dated: January 6, 2022

CARPENTER & ZUCKERMAN
AND MOTLEY RICE LLC

*/s/ John P. Kristensen*
John P. Kristensen
Mary Schiavo

*Attorneys for Plaintiffs*